UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

GENE WILBUR,

        Plaintiff,

      v.                      Case No: 14-CV-0046-PP

COUNTY OF WAUKESHA
AND CITY OF PEWAUKEE,

        Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 29, 32) AND DENYING AS MOOT DEFENDANT WAUKESHA COUNTY'S MOTION TO STRIKE (DKT. NO. 85)**

---

Gene Wilbur filed a complaint against Waukesha County and the City of Pewaukee, challenging the City's disbanding of its police department (by whom he was employed), and the County's decisions not to hire him as a deputy sheriff in 2009 and 2011. Dkt. No. 1. The plaintiff brought a claim for retaliation under 42 U.S.C. §1983 against both defendants (Count I), two claims for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* (Counts II and IV), and a common law claim for defamation against both defendants (Count III). Id. Because plaintiff seeks to impose civil liability on municipalities under §1983, the court construes the complaint as bringing these claims under Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978).

1

Both defendants moved for summary judgment on all of the plaintiff's claims. Dkt. Nos. 29, 32. In his response briefs, the plaintiff abandoned the defamation claim (Count III) and his Title VII retaliation claims (Counts II and IV). Dkt. Nos. 75 at 2 n.1; 76 at 2 n.1. Only the plaintiff's First Amendment retaliation claim under §1983 remains at issue.

The court will grant the defendants' motions for summary judgment. The plaintiff has failed to demonstrate a genuine dispute as to whether the City disbanded its police department in retaliation against him for the exercise of his right to free speech. Nor has he shown a genuine dispute that the County's refusal to hire him was motivated by retaliation against him for the exercise of his free speech rights. The court will deny the County's motion to strike, dkt. no. 85, because the court does not need to strike any material from the record to reach its decision on the defendants' motions for summary judgment.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff joined the City of Pewaukee police department as a part-time officer in 1985. Dkt. No. 30 at ¶1. During the time he was a part-time officer, he also worked in home construction. Dkt. No. 71 at ¶5. While with the Pewaukee Police Department, the plaintiff received commendations and awards. Dkt. No. 71 at ¶6. He received promotions within the police department, and in February 2008, he became a full-time sergeant. Dkt. No. 30 at ¶¶ 2-4. The plaintiff asserts that there were others in the department who were not happy with the plaintiff's promotion, feeling that they should have been considered for the full-time position. Dkt. No. 71 at 2.

Other than his own deposition, the plaintiff refers to two pieces of evidence in support of his claim that there were others in the police department who felt he should not have been "approved to full-time sergeant status." Dkt. No. 71 at ¶7. The first exhibit is the minutes of the City of Pewaukee Fire and Police Commission's February 14, 2008 meeting. Dkt. No. 61-18. Pewaukee Police Chief Gary Bach spoke at that meeting, explaining to the commission that he'd converted the plaintiff—who already held the rank of sergeant—from part-time to full-time, and answering human resources questions. The minutes make no mention of other officers being unhappy with the decision. Id. at 1-2.

The second piece of evidence on which the plaintiff relies is the deposition of one of the other officers, John Kopatich. Dkt. No. 71 at 2-3. The deposition transcript reveals that Kopatich was asked whether the plaintiff went from part-time to full-time status while the two were co-workers at the department, and he answered in the affirmative. Dkt. No. 74-59 at 14. But when counsel asked Kopatich if he was "unhappy that [the plaintiff] had gone to full-time status," Kopatich responded, "No." Id. When counsel asked whether Kopatich "ha[d] an opinion one way or the other" about the plaintiff being made full-time, Kopatich responded, "I thought he should have been made full-time." Id.

In October 2009, the Pewaukee Common Council passed a resolution to disband its police department. Dkt. No. 30 at ¶11. The resolution provided that the City would contract with the Waukesha County for the Sheriff's Department for police services, starting in January 1, 2010. Id. at ¶12.

3

A.    City's Explanation for Disbanding Police Department

According to the City, there were several reasons for the decision to disband the police department. The City was facing a significant budget shortfall, id. at ¶6, and that shortfall was expected to climb, id. at ¶7. The City indicates that there was no police chief (as the plaintiff's version of events will show, police chief Gary Bach was suspended, and there was an acting chief at the time of the disbanding), and the mayor believed that because of strife in the leadership, the department was inefficient and ineffective. Id. at ¶8. The mayor thought that by disbanding the police department, and contracting with the County for police services, the City would obtain more effective and efficient services at a lower cost. Id. at 9-10. The mayor cast the deciding vote in favor of the resolution. Id. at ¶13. The department disbanded on December 31, 2009, id. at ¶19, and the plaintiff's employment with the City ended that same day, id. at 20.

B.    The Plaintiff's Explanation for the Disbanding of the Department

The plaintiff begins his version of the events surrounding the disbanding of the police department with an article that appeared in the Lake Country Reporter newspaper on August 30, 2005. Dkt. No. 74-10. The article reported that during a pig roast at a bar attended by some off-duty Pewaukee police officers, on-duty Pewaukee officers responded to a report of a bar fight. Id. at 1. By the conclusion of the events of that evening, a man had been ejected from the bar, and accusations were being exchanged about who was responsible for the dust-up—the man or the police. Id. at 2.

4

A couple of years later, in April 2007, another media outlet reported that the Pewaukee police chief, Gary Bach, would be suspended for ten days without pay for using "unacceptable and derogatory terms when referring to females and minorities." Dkt. No. 73-14. Days after the article appeared, a sergeant with the Pewaukee police department sent an e-mail to the Pewaukee mayor, alleging that he had been harassed by a number of members of the police department. Dkt. No. 61-31. There followed citizen complaints, investigations, lawsuits and John Doe proceedings involving various members of the police department—including some whom the plaintiff had identified as later being unhappy with Chief Bach having made him full-time. Dkt. No. 71 at ¶¶14-35. The plaintiff himself says that he complained to the acting police chief, Daniel Meister, about officers who had claimed to have seniority over him because they were full-time and he was part-time. Dkt. No. 64-7 at 5.

The plaintiff asserts that in the midst of this turmoil—in November 2008—Chief Bach initiated a John Doe investigation "of potentially criminal conduct by various employees of the City of Pewaukee's Police Department, not including Plaintiff." Dkt. No. 71 at ¶25. In support of this claim, he relies on a newspaper clipping—the exhibit reflects neither the date nor the identity of the publication—reporting that Bach had requested the John Doe, and that Kopatich had allegedly illegally tape recorded Bach to "get the embattled chief fired." Dkt. No. 61-38. He also relies on Kopatich's deposition; Kopatich testified that Bach had opened a John Doe investigation, which had resulted in criminal charges being brought against Kopatich, then dropped. Dkt. No. 74-59

5

at 7. During the deposition, Kopatich testified that while his relationship with Chief Bach had been good in the beginning, but that "towards the end of his tenure . . . him and I began not seeing eye to eye on certain things." Id. at 5.

The plaintiff alleges that the reason the mayor of Pewaukee decided to disband the police department was "because of ongoing investigations and litigation in the City of Pewaukee's Police Department, including investigations of Plaintiff and former Chief Bach . . . ." Dkt. No. 71 at 11. In support of this assertion, he provides a copy of an e-mail from acting police chief Daniel Meister, to "Police Dept," dated September 25, 2009, in which Meister opined that the department was being disbanded due to the investigations and personnel issues. Dkt. No. 74-52. The plaintiff also points to a portion of the deposition of Pewaukee Alderman Dale R. Noll, in which Noll indicates that while Chief Bach was on administrative leave, "we"—presumably he and the other members of the common council—talked about "areas of concern within the [police] department," such as investigations. Dkt. No. 74-143 at 3. The plaintiff provides the deposition of City of Pewaukee administrator Tammy LaBorde, who testified that at the common council meeting at which the mayor discussed disbanding the police department, the mayor provided council members with a document summarizing the issues going on in the police department in September 2009. Dkt. No. 74-149 at 1-3.

The plaintiff disputes that the City was facing financial difficulties at the time it was considering disbanding the police department. Dkt. No. 71 at 12. He refers to a document entitled "2009 Budget Update as of July 27, 2009,"

6

which shows estimated revenue of some $11 million dollars against estimated expenditures of $11.9 million, for a shortfall of over $888,000. Dkt. No. 74-58. This document also reflects the presence of some funds—possibly $200,000; the document is hard to read—for "Possible Transfer from Green Space Fund." Id. at 2. He also supplies a letter from the public works director to City Administrator LaBorde, dated July 13, 2009, in which he explains why using money from other funds to take up the budget shortfall could have negative tax consequences. Dkt. No. 74-53. He cites to the deposition of Alderman Noll, who testified that the common council had discussed, in connection with disbanding the police department, its anticipated budget shortfall for 2009 and 2010. Dkt. No. 74-143 at 1. The plaintiff also points to a March 28, 2011 article in the Lake Country Reporter which indicated that the City ended the year 2010 with a surplus that might exceed $1.6 million. Dkt. No. 74-55. Finally, he relies on a February 7, 2015 article in the Waukesha Freeman, talking about the City's 2006 expenditure of $2.6 million to purchase land for parks and open spaces. Dkt. No. 74-56.

C.    Waukesha County's Hiring Requirement

Waukesha County Enrolled Ordinance 149-35 governed the educational requirements for deputy sheriffs hired after July 31, 1994. Dkt. No. 47 at ¶21. The ordinance referenced the Wisconsin Department of Justice standard requiring law enforcement to have either an associate degree or a minimum of sixty "fully accredited college level credits." Id. The ordinance required that the training and experience requirements for individuals hired as deputy sheriffs

7

for Waukesha County included having "either an associate degree or a minimum of 60 college level credits." Id.

### D. The Plaintiff's First Application

Nineteen former City of Pewaukee police officers, including the plaintiff, applied for employment as deputy sheriffs with the Waukesha County Sheriff's Department after the disbanding of the Pewaukee police department. Id. at ¶32. The plaintiff submitted an electronic application for the position of deputy sheriff. Id. at ¶38. In answer to the specific application question, "Do you possess sixty (60) semester credits of post high school education or an Associates Degree from an accredited university, college, or technical school?," the plaintiff answered, "No." Id. at ¶39. The plaintiff asserts that on two separate occasions, Sylvana Radmer—a human resources analyst with Waukesha County—told him that he didn't need to have the sixty credits, but that because he had been "grandfathered by Wisconsin Training and Standards," the sheriff would need to request a waiver from the Waukesha County Board. Dkt. No. 61-29 at 1 (unsigned document, presumably prepared by the plaintiff). Radmer, on the other hand, states that her only involvement with the plaintiff in the first interview process was her participation in the interviews. Dkt. No. 46 at 3.

Despite the fact that the plaintiff did not have the required degree or sixty credits, the County allowed him to go through the process with the other applicants, and gave him a deadline of January 1, 2010 to show proof that he'd taken the sixty credits. Dkt. No. 47 at ¶44. According to the County, Waukesha

8

County Sheriff Daniel Trawicki was under the impression that the plaintiff was "accumulating this data," and encouraged the plaintiff to get the college credits, because he thought the plaintiff "would be a good employee." Id.

A panel of four County employees interviewed all nineteen applicants for the position of deputy sheriff, including the plaintiff; the plaintiff interviewed on November 17, 2009. Id. at ¶¶45-46. Of the nineteen candidates, the plaintiff and one other applicant received the lowest scores from the panel. Id. at ¶50. The panel did not recommend that the sheriff's department hire the plaintiff, id. at ¶51, because he did not have the required sixty college credits, id. at ¶53. The plaintiff did not obtain the sixty credits by January 1, 2010, so Sheriff Trawicki made the decision not to hire him. Id. at ¶54. The sheriff "did not consult or communicate with anyone from the City of Pewaukee" in making this decision. Id.

The plaintiff disputes this fact, claiming that the City communicated with the sheriff's department about him and scotched his chances of being hired. He claims—citing only to his own deposition testimony—that "Sheriff Trawicki knew that Plaintiff supported Chief Bach while most of the rest of the Pewaukee Police Department was trying to get him out of the department, because Sheriff Trawicki and Plaintiff discussed those events as they unfolded." Dkt. No. 71 at ¶54. He alleges—again, citing to his own deposition testimony and, oddly, the Wisconsin Professional Police Association Contract for the years 2008-2010, dkt. no. 73-5—that "[i]n retaliation for Plaintiff's refusal to lie about or take negative action against Chief Bach, Defendant City of Pewaukee

9

interfered with Plaintiff's application to Defendant Waukesha County Sheriff's Department, resulting in Defendant Waukesha County's denial of his application." Dkt. No. 71 at ¶55. He asserts that of the nineteen former Pewaukee officers who applied to be sheriff's deputies, sixteen were hired. Id. at ¶56. He states that "of those that applied and completed the process, only two were not hired"—the plaintiff and "Cher Sneider." Id. He claims that both he and Sneider "supported Chief Bach." Id. The evidence he cites in support of these contentions is his own deposition testimony.

The plaintiff also claims that Sheriff Trawicki "told City of Pewaukee resident Tim Toman, 'I didn't hire [the plaintiff] because the City [of Pewaukee] didn't ask me to.'" Dkt. No. 71 at ¶60. The sources the plaintiff cites for this fact are the plaintiff's own declaration[1] and deposition. Dkt. No. 64-6 at 28. The plaintiff cites to the minutes of a November 17, 2009 "Personnel Committee" meeting (apparently the personnel committee of the Waukesha County Board), in which the sheriff responded to a committee member's question about whether former Pewaukee officers, if hired, would be assigned to work in Pewaukee. Dkt. No. 61-7 at 1-2. According to the minutes, the sheriff responded that "[s]ome officers do not want to work in the City of Pewaukee and the City of Pewaukee does not want some of their former employees working in their area." The minutes go on to report that the sheriff said that "[i]f people want to work in the City of Pewaukee and the City of Pewaukee

---

[1] The plaintiff cites to his declaration at paragraph 51, but paragraph 51 of the plaintiff's declaration is a description of a letter the plaintiff received from someone named Neil Evans. Dkt. No. 62 at ¶51.

wants them, they will work there. The City of Pewaukee officers will have many opportunities to choose from." Id. at 2.

E.    Audit and Investigation

After the County began to provide police services for the City, Sheriff Trawicki noticed discrepancies in the property room of the City's former police department. Dkt. No. 47 at ¶70. For example, he was "surprised at the number of vehicles [the Pewaukee Police Department had] for the size of the Department." Id. The sheriff also thought that "the amount of ammunition was disproportionately large," and there were silencers missing. Id. He also observed that that there were items in the property room that either had not been disposed of properly, or had not been properly identified. Id. The plaintiff asserts that he was alleged to have been the cause of some of the discrepancies. Dkt. No. 69 at ¶57.

Sheriff Trawicki asked the Walworth County Sheriff's Department to perform an independent investigation and audit, focusing on the property room and concerns involving missing sound suppressors, the purchase of ammunition for personal use, and seized weapons found in inventory. Dkt. No. 47 at ¶¶70-71. Two members of the Walworth County Sheriff's Department, Captain Dana Nigbor and Detective Robert Schiltz, interviewed the plaintiff several times in connection with the investigation. Id. at ¶72.

In a report dated April 19, 2010, Captain Nigbor explained her findings with respect to the three areas of concern: (1) two missing sound suppressors; (2) ammunition; and (3) weapons and inventory of weapons. Id. at ¶74. The

11

County's proposed findings of fact do not go into detail about Nigbor's findings. But the County attached Nigbor's reports—and there were many—to her affidavit. Dkt. No. 49-1 through 49-28. Those reports indicate that the plaintiff was implicated in missing inventory, including allegations that he might have been trading or selling weapons or weapons accessories from the property room. See Dkt. No. 49-19. Some of the people who told Nigbor that the plaintiff had been involved in wrongdoing were some of the people the plaintiff says were displeased with his full-time status—including John Kopatich. Id. at 11.

Captain Nigbor gave her reports and investigative file to the Waukesha County District Attorney, Brad Schimel, who decided not to issue charges. Dkt. No. 47 at ¶78. The County attached Attorney Schimel's letter to Nigbor and her colleague, explaining why he'd declined to issue charges. Dkt. No. 49-29. Attorney Schimel concluded that while the plaintiff had purchased one of the missing suppressors, it later had been found in "a drawer in the office of the municipal judge" and recovered, and that the plaintiff had an application pending for a federal permit for the suppressor. Id. at 2. He also found no evidence that the plaintiff possessed the suppressor after he left the Pewaukee police department. Id. at 3. Attorney Schimel addressed some other irregularities surrounding the Pewaukee Police Department's handling of its firearms inventory, but concluded that these were policy issues and did not rise to the level of criminal violations. Id. at 3-5.

The Sheriff's Department then asked Captain Nigbor to investigate the bidding process for a seized vehicle that the plaintiff had purchased with a

sealed bid at auction. Dkt. No. 47 at ¶75. On June 24, 2010, Captain Nigbor issued a supplemental report, addressing her investigation into the auctioned car. Id. ¶76. Attorney Schimel addressed this issue in his letter, as well. Dkt. No. 49-29. He concluded that the fact that the plaintiff purchased a seized car through a sealed auction process may have violated some City policy, but it did not constitute a criminal violation (and he noted that he had been told of other City employees violating the same policy). Id. at 6.

The plaintiff asserts—with no evidentiary support other than his own deposition—that Nigbor's report did not reflect a fair investigation, but was a "witch hunt." Dkt. No. 69 at 17-18. He indicates that several former Pewaukee employees, including former chief Gary Bach and former acting chief Daniel Meister, provided him with letters responding to the "lies" in Nigbor's report. Id. at ¶72. The County responds that after Nigbor's reports were released, the plaintiff never contacted Captain Nigbor to advise her that the report was incorrect or mistaken in any way. Dkt. No. 47. at ¶79. The plaintiff indicates that he met with Attorney Schimel "to discuss his concerns about the investigation by Walworth County." Dkt. No. 69 at ¶70. Later, the plaintiff and the Lake Country Reporter obtained the investigative file using public records requests. Dkt. No. 47 at ¶¶86-89.

F.    Plaintiff's Second Application

On June 15, 2011, Sylvana Radmer received a letter from the plaintiff requesting that she re-activate his application for a position as a deputy sheriff. Id. at ¶97. The plaintiff included with his letter a transcript from Concordia

University. Id.; Dkt. No. 46-6. The plaintiff asserts—in an unsigned, unsworn document—that he obtained the sixty credits, and informed Radmer of this fact in writing in that June 25, 2011 letter. Dkt. No. 61-29 at 3. The Concordia transcript, while difficult to read, indicates that the plaintiff had sixty "hours." Dkt. No. 46-60.

Because the plaintiff's letters "were connected with the contract with the City of Pewaukee," Radmer consulted the County's human resources manager, James Richter. Dkt. No. 46 at ¶11. Richter advised Radmer to inform the plaintiff that the contract "was concluded," and that the plaintiff would need to go through the normal selection process. Id. Radmer explained this decision to the plaintiff in a letter dated September 7, 2011. Id.

In November 2011, the County began recruiting to fill "an eligibility list" for deputy sheriff positions. Id. at ¶12. The ad for the recruitment indicated that applicants needed to have a high school diploma or GED and sixty credits of college education or an associate degree "by December 15, 2011." Dkt. No. 46-9. The ad also informed potential applicants that "[a] written exam and physical ability test will be administered." Id. The plaintiff again applied to become a deputy sheriff. Dkt. No. 47 at ¶100. The County contacted the plaintiff to schedule a time for him to take the written test, but he did not respond. Id. at ¶101. In a letter to Radmer dated December 2, 2011, the plaintiff explained that he had not scheduled a time to take the written test because none of the other City of Pewaukee police officers who were hired in

14

early 2010 had been required to take a written test. Id.[2] Because the plaintiff

did not schedule a time to take the written test, his application was not

considered for the recruitment list. Id. at ¶102.

G.    Other Applications

In 2013, the plaintiff applied to be a Police Officer with the Village of Elm

Grove Police Department. Id. at ¶109. He was not hired. Id. The plaintiff

communicated with the Elm Grove Police Chief, James Gage, and was informed

that Chief Gage had received records from the 2010 Walworth County Sheriff's

Department investigation file. Id. at ¶110. Chief Gage explained to the plaintiff

that he had received the records either as the result of a signed release, or

under the public records law. Id. Chief Gage stated:

> Regarding the records that you mailed to me earlier
> this month, they do match the records contained in
> our file. They were obtained from the Waukesha
> Sheriff's Department, after presenting them with a
> general consent for release of records, signed by you,
> during your hiring process with us. These records were
> part of a closed investigation and subject to open
> records regardless of the signed release. The Sheriff's
> Department informed us that the record was extensive
> and offered a report summary and district attorney
> summary letter. We received those documents and
> those documents match the copies that you mailed to
> me.
>
> These documents represent a limited portion of our
> entire background investigation and do not represent

---

[2] According to James Richter, three of the former Pewaukee officers whom the
County hired were promoted. Dkt. No. 44. Two officers—Kopatich and Brian
Fredericks—were promoted to the rank of detective in 2010. Both took an oral
exam and a written exam; no exceptions to the promotion policy were made for
them. Id. at ¶11. One—Brian Ripplinger—was promoted to lieutenant in 2012;
he, too, took both an oral and a written exam. Id. at ¶12.

15

> the totality of the circumstances that lead to your
> lower ranking in our process.

Id. at ¶¶109-111.

The plaintiff asserts that Waukesha County "provided the Elm Grove Police Department with false allegations that Plaintiff engaged in misconduct in allegedly improperly submitting a sealed bid for an auctioned vehicle seized by the Pewaukee Police Department." Dkt. No. 71 at ¶85. He asserts that Gage refused to hire him based on this "false information;" again, he supports this assertion only with his own declaration. Dkt. No. 62 at ¶55.

H.    The Parties' Positions Regarding the Reason the Waukesha County Sheriff's Department Did Not Hire the Plaintiff

The plaintiff asserts that at some point during the period prior to the disbanding of the Pewaukee Police Department, he was asked to sign a vote of no confidence against Chief Gary Bach, and that he refused to do so. He indicates that for him to have signed that vote would have constituted a lie, because he did have confidence in Bach. Dkt. No. 64-7 at 11-13. He asserts that after he refused to sign the no-confidence vote, he was threatened by a sergeant in the department, who told the plaintiff that things were not going to go well for him. Dkt. No. 71 at ¶36; Dkt. No. 64-6 at 31 (plaintiff's deposition). The plaintiff argues that "part of the reason" that the Waukesha County Sheriff's Department did not hire him in either 2009 or 2011 was because he had supported Chief Gary Bach. Dkt. No. 71 at ¶36; Dkt. No. 64-6 at 25, 29.

The defendants assert that the Waukesha County Sheriff's Department did not hire the plaintiff in 2009 because he did not have the required sixty

16

credits. Dkt. No. 47 at ¶¶53-54. They claim that the department did not hire the plaintiff in 2011 because he did not schedule a time to take the written test. Id. at 100-102.

## II.    STANDARD OF REVIEW

### A.    Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2).

The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that it is entitled to judgment as a matter of law. Carmichael v. Vill. of Palatine, 605 F.3d 451, 460 (7th Cir. 2010); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the party opposing the motion must then "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at

17

256. A plaintiff abandons a claim by failing to respond to arguments on that claim in a defendant's motion for summary judgment. Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 n.2 (7th Cir. 1996).

    B.    *Monell* Liability

Municipalities, such as the City and County, cannot be held vicariously liable under §1983 based on an individual officer's liability. Monell, 436 U.S. at 691. A plaintiff may sue a municipality directly under §1983 only if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." Id. 436 U.S. at 690. To succeed in recovering against the City, the plaintiff must show that he "(1) suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the City; which (3) was the proximate cause of his injury." King v. Kramer, 763 F.3d 635, 649 (7th Cir. 2014) (quoting Ienco v. City of Chicago, 286 F.3d 994, 998 (7th Cir. 2002)). Liability under Monell "is not founded on a theory of vicarious liability or *respondeat superior* that holds a municipality responsible for the misdeeds of its employees. Rather, a municipal policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation." Woodward v. Corr. Med. Servs. Of Ill., Inc., 368 F.3d 917, 927 (7th Cir. 2004) (internal citations omitted). It is only "when execution of a government's policy or custom inflicts the injury that the government as an entity is responsible

18

under § 1983." Id. (internal quotation marks and alteration omitted) (citation omitted).

> The existence of a policy or custom can be established in a number of ways: the plaintiff may point to an express municipal policy responsible for the alleged constitutional injury, or demonstrate that there is a practice that is so widespread that it rises to the level of a custom that can fairly be attributed to the municipality.

King, 763 F.3d at 649 (citing Estate of Sims v. Cnty. of Bureau, 506 F.3d 509, 515 (7th Cir. 2007)). "When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice." Palmer v. Marion County, 327 F.3d 588, 596 (7th Cir. 2003); see also City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."). The custom or usage as a practice must be "so permanent and well settled that it has the force of law." Looper Maint. Serv. Inc. v. City of Indianapolis, 197 F.3d 908, 912 (7th Cir. 1999).

## III. DISCUSSION

### A. The County's Motion to Strike (Dkt. No. 85)

The County moved to strike certain paragraphs and exhibits from the plaintiff's declaration and supplemental declaration filed in support of his statements of proposed facts and in opposition to the defendants' motions for

19

summary judgment. Dkt. No. 85. The court will deny the County's motion as moot, because the County already had objected to the plaintiff's proposed findings, and no separate motion to strike is required.

Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The 2010 Advisory Committee Comments to this rule explain that it "functions much as an objection at trial, adjusted for the pretrial setting." The person who puts forth the evidence bears the burden of showing that it is admissible as it is presented, and "[t]here is no need to make a separate motion to strike."

The County filed objections to the plaintiff's proposed statements of fact. Dkt. No. 84. It then filed this separate motion to strike. In the three-page motion, the County asks the court to strike over six dozen exhibits and paragraphs from the plaintiff's declarations. The County did not file a supporting brief in support of the motion, or a certificate that no such brief would be filed, as required by Civil Local Rule 7(a). The motion does not provide any arguments as to the specific reasons the County asserts that the court should strike each paragraph or exhibit.

The court will treat the County's motion to strike as additional objections to the documents and exhibits the plaintiff submitted to support his proposed findings of fact. The court will consider whether plaintiff has properly supported his factual assertions under Rule 56(c)(1), and will consider the defendants' proposed facts to be undisputed if the plaintiff has not created a

genuine dispute with regard to a specific proposed fact, whether through his own objections, proposed statements of fact, or exhibits. See Fed. R. Civ. P. 56(e). The court will deny the motion to strike as moot.

B.    The Defendants' Motions for Summary Judgment (Dkt. Nos. 29, 32)

In Count I—the only remaining count of the compliant—the plaintiff alleges that the defendants retaliated against him for his support of former Chief Gary Bach, in violation of the First Amendment. According to the plaintiff, his employment problems "started with his association with Chief Gary Bach." Dkt. No. 76 at 6. The plaintiff asserts that his association with, and support for, Chief Bach motivated the defendants to impede his ability to obtain employment as a Waukesha County Deputy Sheriff or with another police department.

To establish a *prima facie* case of First Amendment retaliation, a plaintiff must show that: (1) his speech was constitutionally protected; (2) he suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating factor in the employer's action. George v. Walker, 535 F.3d 535, 538 (7th Cir. 2008) (citing Massey v. Johnson, 457 F.3d 711, 716 (7th Cir. 2006)).

Under the First Amendment, "speech is constitutionally protected if '(1) the employee spoke as a citizen on matters of public concern, and (2) the interest of the employee as a citizen in commenting upon matters of public concern outweighs the interest of the State as an employer in promoting the efficiency of the public services it performs through its employees.' " Nagle v. Vill. of Calumet Park, 554 F.3d 1106, 1123 (7th Cir. 2009) (quoting Sigsworth

21

v. City of Aurora, 487 F.3d 506, 509 (7th Cir. 2007)). "Speech deals with a matter of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.' " Snyder v. Phelps, 562 U.S. 443, 453 (2011) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). Conversely, speech is not a matter of public concern if it involves "merely a personal grievance of interest only to the employee." Gustafson v. Jones, 290 F.3d 895, 907 (7th Cir. 2002) (citing Connick, 461 U.S. at 146). The court's inquiry is guided by the "content, form, and context" of the employee's statement based on the record as a whole. Connick, 461 U.S. at 147-48. Of those factors, content is the most important. Kristofek v. Vill. of Orland Hills, 712 F.3d 979, 984 (7th Cir. 2013) (citing Chaklos v. Stevens, 560 F.3d 705, 712 (7th Cir. 2009)).

   1. *Protected Speech*

  The First Amendment activity in which the plaintiff claims to have engaged appears to be the fact that he refused to sign the no-confidence vote against Chief Bach, and that he "supported" Bach as opposed to those people in the Pewaukee Police Department who allegedly wanted Bach ousted. Despite the hundreds of supporting documents the plaintiff filed, it is not clear from the record what the plaintiff did to "support" Bach, other than refuse to sign the no-confidence vote. Various witnesses testify that they knew that the plaintiff and Bach "were friends," or "got along." The plaintiff alleges that he was not one of the targets of the John Doe investigation Bach initiated. But

22

there is no record evidence that the court could find indicating that the plaintiff stood up in meetings and defended Bach, or wrote letters to people in support of Bach, or spearheaded a campaign to keep Bach from being suspended or dismissed.

Because this is the summary judgment phase, however, the court must draw all inferences in the light most favorable to the plaintiff. Accordingly, the court will assume for the purposes of this decision that the plaintiff's words or actions regarding Gary Bach constituted protected speech.

2.    *Deprivation Likely to Deter Protected Speech*

The plaintiff alleges that the defendants subjected him to two deprivations that were severe enough that they were likely to deter protected speech. First, he alleges that the City disbanded the police department—thus depriving him of a job he'd held for many years—"because he engaged in free speech and associated with Chief Bach on a matter of public concern—namely, eliminating corruption in the department." Dkt. No. 76 at 5-6. Second, he argues that both defendants impeded his ability to obtain employment—either with the Waukesha County Sheriff's Department or with other employers. He asserts that the City did this by providing potential employers with false information about him. He alleges that the County did this by refusing to hire him.

The plaintiff's claim that the City of Pewaukee took the drastic step of dismantling its entire police force on his account stretches credibility. But generally, summary judgment is not the appropriate place for determinations of

23

credibility. See, *e.g.*, Washington v. Haupert, 481 F.3d 543, 550 (7th Cir. 2007), quoting Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.") And the court does not need to determine whether the plaintiff's belief is credible for this prong of the First Amendment claim—the court can draw the inference that shutting down the department which employed the plaintiff for years is an action "likely to deter" protected speech.

The same is true of the plaintiff's claims that Pewaukee interfered with his attempts to gain employment with the County, and with other employers. The court can reasonably draw the inference that taking action to prevent someone from getting a job is action "likely to deter" protected speech.

3. *Motivating Factor*

Despite the substantial number of documents he has filed, however, the plaintiff has produced no evidence to support his claim that his support of Gary Bach was "at least a motivating factor" in the City's decision to dismantle the police department, or in the County's decision not to hire him as a deputy sheriff.

a. Dismantling the Police Department

The record is devoid of any evidence supporting his claim that the City decided to disband the police department as a result of the plaintiff's support of Gary Bach. The plaintiff supplied many documents which he indicates demonstrate that there was corruption in the Pewaukee Police Department.

24

Some of the documents—a number of them, in fact—are newspaper articles, which constitute inadmissible hearsay under Fed. R. Evid. 803 if—as it appears he does—the plaintiff provides them to prove the truth of the matter they assert.[3] The plaintiff submitted a number of documents that he appears to have created—summaries, memos to other people. Some are not dated, some are not signed. Most, if not all, contain his *opinions*, which he puts forth as fact. He also has submitted e-mails, complaints, meeting minutes and deposition transcripts.

Even if all of that evidence—every single one of the over one hundred documents he has filed—were admissible into evidence, *none* of them (other than the documents in which the plaintiff himself expresses his opinions) support his claim that the City dismantled the police department to punish him for his support of Bach.

The City concedes that part of the reason it disbanded the police department was because the department was plagued with management and other problems. Many of the documents the plaintiff submitted *do* support the conclusion that the Pewaukee Police Department was having problems between 2007 and 2009—the plaintiff's documents show that the department was in the news frequently, that Chief Bach had requested a John Doe investigation, that officers were filing suits, that citizens were filing complaints.

But proof that the City was motivated to disband the police department because the department was troubled does not equate to proof that the City

---

[3] The defendants also submitted at least one news article. Dkt. No. 48-14.

was motivated to disband the police department because the plaintiff supported Bach. In order for a reasonable jury to reach that conclusion based on the evidence in this record, it would have to draw a number of conclusions. It would have to conclude Bach was the "good guy" in a fight against corruption. It would have to reach that conclusion in the face of record evidence that Bach was the subject of allegations of improper behavior.

The jury then would have to conclude that the City—presumably through the mayor and the common council—wanted to punish Bach and anyone who supported Bach. There is no evidence in the record to support this.

The jury would next have to conclude that the City disbanded the police department to effect that punishment. Again, there is no record evidence to support this conclusion. The evidence shows that the City wanted to (a) save money and (b) deal with what it perceived as an overall lack of management at the department. While Bach was suspended, and eventually left the police department, the record evidence does not support the plaintiff's claim that the City disbanded the police department to punish Bach and his supporters. The record evidence shows that the City was concerned with the state of the police department overall, without any particular assignment of blame for the state of disarray. The common council and City administration witnesses talked about problems with *the police department*, not problems with Bach or the plaintiff. The plaintiff believes and asserts that the City was motivated to disband the department because of him; that belief, without more, does not create a genuine dispute as to that fact.

26

The finder of fact would have to conclude that the City's stated motivations for disbanding the department—the turmoil within in, and the City's financial problems—were not the City's true motivating factors. The plaintiff disputes that part of the City's motivation for disbanding the department was financial. Yet the documents he himself put forward, admissible or not, *support* the City's argument that it had a budget shortfall in 2009. The plaintiff provided a newspaper article indicating that the City had spent money to buy park land in 2006—three years before the disbanding of the police department. The fact that the City had money enough to make such a purchase in 2006 not only fails to demonstrate that there was no shortfall in 2009, but it could be a partial explanation for the 2009 shortfall. The plaintiff provided City budget information for 2009, which showed the $888,000 shortfall but also showed that the City had a small green space fund that it could have used to offset the budget shortfall. Even accepting that document as true, applying the small green space fund to the shortfall would only have reduced it, not obliterated it. And the plaintiff also provided a document from Radmer, explaining to one of the alderman why that kind of borrowing from Peter to pay Paul could have negative tax repercussions. The plaintiff provided a newspaper article indicating that in the year after the City disbanded the department, it ended up with a budget surplus. Again, this fact does not prove that the City did not have a surplus in 2009; arguably, it is circumstantial proof that the decision to disband the police department and outsource law

enforcement services to the County did exactly what the City hoped it would do—saved the City money.

So—while there is evidence that the Pewaukee Police Department was troubled, and there is evidence that the City chose to deal with that trouble (and with its budget problems) by disbanding the department, there is no evidence—other than the plaintiff's unsupported opinions—that the City was motivated to disband the department by the plaintiff's support of Gary Bach.

> b.    County's Decision Not to Hire the Plaintiff in 2009

The plaintiff asserts that the City influenced the County's decision not to hire him as a sheriff's deputy in 2009. The plaintiff provides no evidence that the City communicated with the Waukesha County Sheriff's Department about whether the sheriff's department should or should not hire the plaintiff in the wake of the dismantling of the City's police department. The "evidence" the plaintiff has provided in support of this claim is his own statement that a resident of Pewaukee told him that Sheriff Trawicki told the resident that Trawicki didn't hire the plaintiff because Pewaukee didn't ask Trawicki to hire the plaintiff. This is double hearsay; the plaintiff provides no proof that this resident exists, or that the resident made the statement. He points to minutes of a meeting in which Trawicki told the Waukesha County Personnel Committee that, *if* the sheriff's department hired any former Pewaukee officers, those officers could work in Pewaukee if they, and the City, wanted them to. Again, this is hearsay, but even if it were admissible, the court fails to see how it demonstrates that the City told the sheriff's department not to hire the

28

plaintiff. The record is devoid of evidence—other than allegations by the plaintiff—that the City took action to convince the County not to hire the plaintiff.

In an attempt to support his <u>Monell</u> claim against the City, the plaintiff points to the fact that the other former Pewaukee police officer whom the County did not hire was Cher Sneider. Dkt. No. 75 at 14. He references various pieces of evidence to demonstrate that Sneider, like the plaintiff, supported Bach. He asserts that in November 2008, Kopatich questioned Sneider about "Chief Bach and an internal investigation at the Pewaukee Police Department," that she took notes of that questioning, and that she gave these notes to the plaintiff. Dkt. No. 71 at ¶21. The plaintiff refers to Dkt. No. 74-14 in support of this assertion; this document is a memo dated Monday, November 3, 2008, unsigned, written in the first person. The plaintiff also asserts that Sneider gave him a copy of the letter she sent to Chief Bach "describing the controversy surrounding the tape recordings of Chief Bach at the Pewaukee Police Department." <u>Id.</u> He refers to Dkt. No. 74-15, an undated letter signed by Cher Sneider; it is not addressed to anyone, but Sneider indicates that she will be delivering it to Gary Bach. The letter is supportive of Bach, indicating that Sneider is concerned that Kopatich and others are trying to get Bach fired. <u>Id.</u> The plaintiff cites Kopatich's deposition, in which Kopatich indicates that he was aware that Sneider had supported Bach during the internal investigations, and had a good relationship with Bach. Dkt. No. 71 at ¶39, citing Dkt. No. 74-

29

59 at 9 (Kopatich deposition). He also refers to the deposition of another former Pewaukee officer. Dkt. No. 71 at ¶40.

The plaintiff concludes that "Defendant City of Pewaukee's refusal to support its only two police sergeants who supported Chief Bach, thereby denying them equal employment opportunities with Defendant Waukesha County, was a policy and practice so well established as to constitute an unwritten city policy of unlawful retaliation." Dkt. No. 71 at ¶53. He reiterates that the County hired sixteen former Pewaukee officers, and that of all Pewaukee officers who "applied and completed the process, only two were not hired"—the plaintiff and Sneider—and that both "supported Chief Bach." Id. at ¶56.

This argument fails for several reasons. First, the plaintiff reaches this conclusion by means of an association fallacy. He argues that the City did not "support" him, and he was a Bach supporter. He argues that the City did not "support" Sneider, and she was a Bach supporter. These facts compel the conclusion, he argues, that the City's lack of support for him and Sneider was the reason the County did not hire them. The conclusion, in itself, is based on a faulty association. The plaintiff also could make the following argument: He is a police officer, and he lives in Wisconsin. Sneider is a police officer, and she lives in Wisconsin. Therefore, because the County did not hire either of them, the reason must have been because they are police officers who live in Wisconsin. The similarities between the two do not compel the conclusion the plaintiff encourages the court to reach.

30

Second, even if the City did not "support" him or Sneider, the plaintiff provides no proof that the City communicated this lack of support to the County. The plaintiff's allegations about himself rest on supposition and speculation; his allegations about Sneider suffer the same flaw.

Third, the fact that the City did not "support" two officers who "supported" Bach does not constitute "a practice that is so widespread that it rises to the level of a custom that can fairly be attributed to the municipality." King, 763 F.3d at 649 (citing Estate of Sims v. Cnty. of Bureau, 506 F.3d 509, 515 (7th Cir. 2007)). It is not clear what "support" the plaintiff believes the City was constitutionally obligated to survive. He provides no evidence, for example, that the City gave him, or Sneider, bad recommendations when they applied to the County. He provides no evidence that employees of the City contacted the County and told the County bad things about the plaintiff or Sneider. The plaintiff asserts that other officers supported Bach, and were hired by the County, and asks the court to infer from that fact that the City had an unwritten policy to thwart his and Sneider's efforts to obtain jobs with the County. While the court is required to draw all *reasonable* inferences in favor of the non-moving party, this is not a reasonable inference, and cannot support a Monell claim against the City.

Nor does he provide any evidence that the County refused to hire him in retaliation for his support of Bach. The record evidence demonstrates that under the county ordinance, the plaintiff—and any other person applying to be a sheriff's deputy—was required to have an associate degree or sixty college

31

credits. The plaintiff does not provide proof that he had either of those things at the end of 2009 or in early 2010. Nor does he dispute that he did not obtain the sixty credits prior to the January 1, 2010 deadline Sheriff Trawicki had set. Rather, he expresses his belief that Trawicki knew he supported Bach, and that this was why Trawicki did not hire him. Speculation and innuendo are insufficient to defeat a summary judgment motion. Gunville v. Walker, 583 F>3d 979, 986 (7th Cir. 2009) (citing Liu v. T & H Machine, Inc., 191 F.3d 790, 796 (7th Cir. 1999) ("A party must present more than mere speculation or conjecture to defeat a summary judgment motion.")). "[W]hen the evidence provides for only speculation or guessing, summary judgment is appropriate." Davis v. Carter, 452 F.3d 686, 697 (7th Cir. 2006).

As circumstantial evidence in support of his claim, the plaintiff cites to Wis. Stat. ¶59.26(10), which provides in part that in cases where a county provides law enforcement services to a municipality that has abolished its police department, "the sheriff shall, to the greatest extent possible, fill the additional deputy positions from the ranks of former police officers who lost their positions when their department was abolished[.]" Wis. Stat. §59.26(10)(a). Dkt. No. 75 at 13. The plaintiff argues that under this statute, the sheriff's department was "statutorily required to hire City of Pewaukee former police officers 'to the greatest extent possible' . . . within 24 months after the contract" with the City took effect. Id. at 13-14. The plaintiff then restates the argument—"Waukesha County was thus, for a period of 24 months after January 1, 2010, statutorily required to hire all available Pewaukee

32

officers." Id. at 14. This restatement mischaracterizes the statute. The statute did not require the County to hire all available Pewaukee officers. The statute required the count to hire former Pewaukee officers to fill existing positions "to the greatest extent possible." It was not "possible" for the County to hire the plaintiff, because he did not have the sixty college credits required by the county ordinance.

The plaintiff next argues that he was not required to have sixty credits in order to be hired. He claims that Trawicki told him in late 2009, in a conversation at Trawicki's home, that the plaintiff could be "grandfathered in."[4] Id. He also asserts that City administrator Radmer told him he could be hired via a waiver. Id. While Trawicki testified at his deposition that he believed that people could be "grandfathered" in, dkt. no. 48-11 at 16, his testimony was that the plaintiff appeared to him to believe that, through a combination of college credits and work experience, the plaintiff already *had* the sixty credits, or their equivalent, and that the plaintiff was "putting it together for a presentation, if you will," id. at 17-18. Radmer does not appear to have had any personal contact with the plaintiff until he appeared before the interview panel; she was one of the panelists. Dkt. No. 46 at ¶3-7.

---

[4] James Richter, the County's human resources director, explains that Enrolled Ordinance 149-35 grandfathered in "all Deputy Sheriffs who became law enforcement officers prior to February 1, 1993 and were then existing employees with the Sheriff's Department." Dkt. No. 44 at ¶6. The plaintiff was not an existing employee of the County prior to, or on, February 1, 1993; the grandfather provision does not appear to have applied to him. All three of these individuals are people whom the plaintiff claims throughout his pleadings were part of the group that wished to get rid of Chief Bach.

33

The plaintiff's arguments demonstrate that there are disputes of fact between what he believes Trawicki and Radmer told him about the sixty-hour requirement, and what Trawicki recalls and how Radmer was involved. If the plaintiff had sued Trawicki and Radmer in their individual capacities, these disputes might be sufficient to allow this part of the plaintiff's claim to survive summary judgment. But the plaintiff has sued the *County*, not Trawicki and Radmer, and he may sue the County only under <u>Monell</u>. To survive summary judgment on a <u>Monell</u> claim, the plaintiff must demonstrate more than a dispute regarding an isolated incident by one or two County employees—he must demonstrate a pattern or practice "so well settled that it has the force of law." <u>Looper Maint. Serv. Inc. v. City of Indianapolis</u>, 197 F.3d 908, 912 (7th Cir. 1999). Even if the plaintiff has demonstrated a genuine dispute regarding whether he was told he could be grandfathered in, or could be hired with a waiver, that dispute is not enough to get him past summary judgment on a <u>Monell</u> claim.

The plaintiff makes other arguments in support of his claim that the County's failure to hire him was retaliation for his support of Bach. He argues that he was better qualified than officers like Kopatich, whom the County did hire (and whom the interview panel ranked highest on the list of applicants). Dkt. No. 69 at ¶¶80-92. He argues that these officers had been subject to discipline while with the City, and yet the County hired them. <u>Id.</u> He argues that three of these former Pewaukee officers were eventually promoted by the County; he states that he "believes that they made false statements about

Case 2:14-cv-00046-PP   Filed 03/23/17   Page 34 of 42   Document 94

Plaintiff and were rewarded for it by Defendant Waukesha County." Id. at ¶92. These arguments are red herrings. Regardless of how good an officer the plaintiff was, or whether he'd been disciplined less than other officers, he does not dispute the fact that he did not have an associate degree or sixty college credits in January 2010. And his beliefs are not evidence sufficient to overcome a motion for summary judgment.

The court can understand the logic behind the plaintiff's belief that individual former Pewaukee officers may have wanted to retaliate against him for supporting Bach; the evidence the plaintiff has provided supports the inference that there was internecine warfare in the Pewaukee Police Department prior to its demise. The court is stymied, however, by the logic behind the plaintiff's claim that the *County* would have a reason to retaliate against him for his support of Bach. He provides no evidence that the County, or anyone employed by the County, was an enemy of Bach's, or had reason to dislike Bach. He provides no evidence that the County had any prior alliances or affiliations with the former Pewaukee officers whom it did hire. It is not clear to the court why the plaintiff believes the County, or even individual county employees, would want to retaliate against him for his support of Bach, even if he'd provided evidence to support that belief.

c.     Investigation and Audit

The plaintiff argues that when the Walworth County Sheriff's Department conducted the investigation of the defunct Pewaukee Police Department's property room, the resulting report contained false information and lies. The

35

plaintiff believes that former Pewaukee employees, such as Kopatich, provided false information to the Walworth County investigators in retaliation against the plaintiff for his support of Bach.

The record does not support this claim. It is true that District Attorney Schimel concluded that the issues the investigation uncovered did not rise to the level of criminal conduct. That conclusion does not prove that anyone lied to the Walworth County investigators, or provided them with false information. Schimel did not indicate that any of the information he had received was unreliable or false. He opined that the information might demonstrate that the plaintiff (and others) may have violated department, or City, policies. He found only that the information he'd been provided did not support criminal charges.

It is clear that the plaintiff does not believe that he should have been a target of the Walworth County investigation, and he does not agree with the information that Pewaukee employees provided the investigators. But there is no evidence, other than the plaintiff's protestations, that these individuals deliberately provided false evidence in an investigation, or that they did so to punish the plaintiff for supporting Bach. And even if the plaintiff had submitted record evidence in support of his claim, the fact that some individual former City employees may have lied about him to punish him for his support of Bach does not provide the pattern-or-practice evidence necessary to prove a <u>Monell</u> claim against the City.

d.    County's Decision Not to Hire the Plaintiff in 2011

In the fall of 2011, the plaintiff contacted the County and provided his transcript, showing that he had sixty "hours" of college credit. This was, he indicates, an attempt to "reactivate" his 2009 application. Dkt. No. 75 at 15. The record shows that Radmer, in consultation with James Richter, notified the plaintiff that because the hiring under the City/County contract was finished, he'd need to take a written test like any other applicant. When the plaintiff responded to the 2011 recruitment ad, the County contacted him to set up a date for him to sit for the exam. He did not schedule a date, and so the County did not consider him for the eligibility list.

The plaintiff argues that the requirement that he sit for a test before being considered for the eligibility list was a pretext. Id. at 14. He argues that under §59.26(10)(a), the County was required, during the two-year window after the contract between the City and the County became effective, to hire former Pewaukee police officers. Id. The contract went into effect January 1, 2010, so the plaintiff argues that the County's obligation to hire him continued through December 31, 2011. He alleges that he "renewed" his application during the two-year period, but that the County "ignored the statutes and required the Plaintiff to submit an entirely new application." Id.

The court already has discussed the fact that the statute did not require the County to hire the plaintiff; it required the County, "to the greatest extent possible," to fill open deputy positions with former Pewaukee officers. There is no evidence in the record that the County had any open deputy positions in

37

June, or November, of 2011. The evidence indicates that in November 2011, the County was recruiting to fill an "eligibility" list, not to hire new deputies. And the statute did not mandate hiring—it mandated trying, "to the greatest extent possible," to fill open positions with former officers of abolished departments whose services the County had assumed.

The plaintiff's argument raises a different issue: whether, once the plaintiff provided proof of his sixty credits in 2011,[5] the County was obligated to suspend the exam requirement for him.

The County's human resources manager, James Richter, provided an affidavit. Dkt. No. 44. In it, he explains that when the contract between the City and the County went into effect on January 1, 2010, the County "was in a position to hire all applicants." Id. at ¶2. Because the contract was going into effect in a short period of time, the County "had limited time to conduct interviews, background investigations and physical and psychological testing of the 19 applicants" from Pewaukee. Id. at ¶3. For that reason "the required standard written test was waived for that recruitment and the interviews were conducted concurrently with the background investigations." Id. Richter states that when the plaintiff re-applied (based on a new recruitment effort) in 2011,

---

[5] At various points in his pleadings, the plaintiff tries to conflate the January 2010 and summer/fall 2011 time periods. He admits that he did not have sixty college credits in January 2010, when the County declined to hire him the first time. He insists that he did have sixty credits by the summer of 2011, then argues that because he eventually did get the credits, the County's argument that it did not hire him in 2010 because he didn't qualify is pre-textual. This argument is disingenuous; it amounts to an argument that the County had reason to know that, although the plaintiff didn't have the credits in January 2010, he would eventually obtain them eighteen months later.

he told Radmer that because "the 2009 recruitment of the former City of Pewaukee police officers was concluded in 2009, [the plaintiff] would have to take the required standard written examination during the 2011 recruitment." Id. at ¶10. The written exam, Richter explains, is mandated by Waukesha County Code of Ordinances § 7-137(a). Id. Because the plaintiff did not schedule a time to take the test, the County did not consider him for the eligibility list.

This evidence shows that in the 2009-2010 hiring period, the County waived a pre-interview testing requirement for all 2009 Pewaukee applicants due to the urgency of the time situation. When the plaintiff asked to "re-activate" his application in June 2011, and when he re-applied in November 2011, that peculiar timing issue no longer applied. There is no evidence that the County had open positions at that time, and no evidence that there was any time crunch to fill positions. The County did not appear to have any need to waive the exam requirement in 2011; the ad advised all comers that they would have to sit for the exam.

The plaintiff has provided no evidence to the contrary; he asserts only that he believes that the exam requirement was a pretext to allow the County to punish him for supporting Bach. Nothing in the record supports this claim. Even had the plaintiff presented evidence that Radmer and Richter did try to punish him for supporting Bach, that evidence would not support a Monell claim.

e.     Other Potential Employers

The plaintiff asserts that in the years following the County's refusal to hire him, he applied for jobs with the Elm Grove Police Department, dkt. no. 69 at 93; the Brookfield Police Department, <u>id.</u> at ¶96; and the Village of Summit Police Department, <u>id.</u> at ¶98. He alleges that the County "provided the Elm Grove Police Department with false allegations" regarding his purchase of the auctioned car, and that "Chief Gage refused to hire Plaintiff" based on that "false information." <u>Id.</u> at ¶94. He alleges—supported by his own deposition testimony—that the other municipalities did not hire him, or did not hire him right away, because of the investigation and audit. <u>Id.</u> at ¶¶96-98. He also alleges that the Wisconsin State Fair Police denied him three promotions after the investigation and audit. <u>Id.</u> at ¶97.

While the plaintiff's statements imply that the County somehow went to Elm Grove with the information regarding the investigation and audit, Elm Grove Police Chief Gage's letter to the plaintiff says otherwise. Gage indicated that he obtained the information either because the plaintiff had consented as part of his application to Elm Grove, or via a public records search. Gage also told the plaintiff that the investigation results were only part of the reason he'd decided not to hire the plaintiff. As to the other municipalities and entities, the plaintiff provides no evidence that they did not hire him (in the case of Brookfield), or failed to promote him (in the case of the State Fair police), or made him apply three different times (in the case of the Village of Summit) as a result of the investigation.

40

The court already has discussed the fact that the record contains no evidence that the information the former Pewaukee officers provided to the Walworth County investigators was false, or that their motivation in providing the false information was the plaintiff's support of Bach. The plaintiff applied for other law enforcement jobs. When he did, those employers conducted background checks, as one would hope law enforcement agencies would do. The plaintiff provides no evidence that the County actively tried to "badmouth" him to potential employers. Those employers obtained information that already existed. There is no evidence of the defendants retaliating against the plaintiff in connection with his efforts to find or hold other jobs.

C. <u>Summary</u>

The plaintiff worked his way up through the ranks of the City of Pewaukee police department over many years, becoming a full-time sergeant, and earning commendations and awards. It is understandable that he would be angry and disappointed at his inability to obtain a new job as a Waukesha County Sheriff's Deputy, when other officers—whom he considers less qualified, and whom he considers to lack his integrity—were able to obtain those jobs. Given the issues plaguing the Pewaukee police department before it was dismantled, the court does not doubt that some of the plaintiff's fellow officers did not appreciate his support of a chief described as "embattled." But the plaintiff has failed to provide anything more than supposition and speculation to support his claim that the City and the County retaliated against him for that support. The plaintiff does not dispute that he did not

have sixty credits in January 2010. Nor does he dispute that when he applied in November 2011, the ad and the county ordinance required applicants to take an exam—one he did not take. In the face of these facts, the plaintiff needed to produce more than supposition and speculation to allow his claims of municipal liability for First Amendment retaliation to go to a jury. The court will grant the defendants' motions for summary judgment.

## IV.   CONCLUSION

For the reasons explained in this order, the court **DENIES AS MOOT** the County's motion to strike. Dkt. No. 85.

The court **GRANTS** the defendants' motions for summary judgment as to the plaintiff's <u>Monell</u> retaliation claims under §1983. Dkt. Nos. 29 and 32. The court **DISMISSES** the plaintiff's complaint in its entirety. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 23rd day of March, 2017.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge